UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

HERROL JEAN PHILIPPE,

Plaintiff,

v.

SANTANDER BANK, N.A.,

Defendant.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-2918 (MKB) (CLP)

MARGO K. BRODIE, United States District Judge:

Plaintiff Herrol Jean Philippe commenced the above-captioned action against Defendant

Santander Bank, N.A. on May 20, 2015, alleging retaliation in violation of the Family Medical

Leave Act, 29 USC § 2601 *et seq.* ("FMLA"), and disability discrimination under the New York

State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL") and the New York City

Human Rights Law, N.Y.C. Admin. Code § 8-101, *et seq.* ("NYCHRL"), based on the

termination of his employment. (Compl., Docket Entry No. 1.) On July 7, 2015, Plaintiff

amended his Complaint to add a claim of disability discrimination under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"). (Am. Compl., Docket Entry No.

7.) Defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure on May 26, 2017. (Def. Mot. for Summ. J. ("Def. Mot."), Docket Entry No. 29; Def.

Mem. in Supp. of Def. Mot. ("Def. Mem."), Docket Entry No. 29-1.) By order dated October 6,

2017, the Court referred Defendant's motion to Magistrate Judge Cheryl L. Pollak for a report

and recommendation. (Order dated Oct. 6, 2017.)

By report and recommendation dated February 28, 2018, Judge Pollak recommended that

the Court deny Defendant's motion for summary judgment ("R&R"). (*See generally* R&R,

Docket Entry No. 35.) Defendant filed objections to the R&R on March 13, 2018. (Def. Obj. to R&R ("Def. Obj."), Docket Entry No. 36.) Plaintiff filed a response to Defendant's objections, requesting that the Court adopt the R&R it its entirety. (Pl. Opp'n to Def. Obj., Docket Entry No. 38.) For the reasons set forth below, the Court denies Defendant's motion for summary judgment as to Plaintiff's FMLA, NYSHRL, and NYCHRL claims, dismisses Plaintiff's Title VII disability claim, and grants Plaintiff leave to amend his Amended Complaint to include a claim under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (the "ADA").

## I.  Background

The Court assumes familiarity with the underlying facts as detailed in the R&R and provides only a summary of the pertinent facts and procedural background. The following facts are undisputed unless otherwise noted.

### a.  Factual background

Plaintiff began his employment with the Bank on July 30, 2012 as the branch manager of the 31st Avenue branch in the Bank's Queens/Long Island District, which district consisted of nineteen branches. (Def. Statement of Material Facts Pursuant to Local R. ("Def. 56.1") ¶ 1, Docket Entry No. 29-2; Pl. Statement of Material Facts Pursuant to Local R. ("Pl. 56.1") ¶ 1, Docket Entry 32-1.) At the start of his employment, Plaintiff reported to the District Executive, Benedetta LeoGrande, who reported to the Regional President, Josephine Moran. (Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.) In May of 2013, Michael Billia replaced LeoGrande as Plaintiff's supervisor. (Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.)

As a branch manager, Plaintiff was responsible for, *inter alia*, "managing the operations and employees of his branch, and ensuring the branch achieved its sales goals," (Def. 56.1 ¶ 4;

Pl. 56.1 ¶ 4).  In particular, "[b]ranch managers were responsible for achieving certain sales and performance benchmarks."  (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10.)  To track performance, Defendant employs various metrics including "WAP" (Weighted Average Performance), an accumulation of several different sales categories.  (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.)  Billia set the WAP "target" at 100% for each branch in the district.  (Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12.)  Throughout the time he was employed by Defendant, Plaintiff's WAP figures were low in comparison with that of other branches and managers.  (*See* Queens/Long Island WAP Numbers, attached to Def. Mot. as Ex. J, Docket Entry No. 29-3.)  Other managerial duties included the approval of electronic time submissions ("eTime") by subordinates on a bi-weekly basis.  (Def. 56.1 ¶¶ 8–9; Pl. 56.1 ¶¶ 8–9.)  Beginning in March of 2014, branch managers were also encouraged to participate in the Santander Spirit award program ("Santander Spirit"), "an incentive program through which [Defendant] encouraged managers to award recognition to their subordinates in the form of points that could be redeemed for gifts from the Bank."  (Def. 56.1 ¶¶ 6–7, 107–08.)

Defendant contends that in October of 2012, "LeoGrande placed Plaintiff on a development plan, which listed deficiencies in time management and operations systems."  (Def. 56.1 ¶ 22.)  Plaintiff concedes that he was given a "development plan," which included entries in a section titled "Development Needed."  (Pl. 56.1 ¶ 22.)

Months later, in February of 2013, Defendant gave Plaintiff a rating of "Expectations Totally Met" for his first performance review.  (Pl. Feb. 1, 2013 Branch Manager Performance Review, annexed to Certification in Supp. of Def. Mot. as Exhibit I.)[1]  Despite this rating, LeoGrande also provided negative feedback in the performance review stating:

> [Plaintiff] has struggled with production since he was assigned to

---

[1]  The Certification of Defendant's attorney Rachel A. Seaton identifies Exhibits A through Exhibit AA.  (Certification in Supp. of Def. Mot., Docket Entry No. 29-3.)

> the 31st Avenue branch.  As a newly hired Branch Manager in 2012,
> I expected that he would require a period of acclimation, however I
> believe the results should be better than they are after three quarters.
> Failure to meet goals at a branch as large as 31st Avenue greatly
> impacts the results of the entire Queens/Long Island district in a
> negative way.

(Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28 (quoting Plaintiff's Feb. 1, 2013 Branch Manager Performance

Review).)  Defendant also gave Plaintiff a numeric rating of 2.52 out of 5.00.  (Def. 56.1 ¶ 25;

Pl. 56.1 ¶ 25.)  Plaintiff contends that "at the time of this review, he discussed with . . .

LeoGrande his concerns about the staffing levels at the branch," explaining that the branch was

supposed to have five employees working rather than the two it often had.  (Pl. 56.1 ¶ 31.)

Plaintiff concedes, however, that understaffing had been a common area of concern among other

branch managers.  (Def. 56.1 ¶ 33; Pl. 56.1 ¶ 33.)

In July of 2013, Billia placed Plaintiff on a performance improvement plan ("PIP"),

which listed the following areas in which improvement was required:

> Improvement needed in overall leadership of the team, including the
> management, coaching and inspection process.  Must increase the
> level of focus and clarity around expected sales behaviors and hold
> his team more accountable for activities and results.
>
> Needs to continue to be involved in the day to day operations to
> ensure the branch is maintaining a high level of operational
> integrity.
>
> Needs to give guidance and provide solutions regarding overcoming
> branch and market obstacles.
>
> Meet targets in Solutions, profit pool, credit cards, RAF and
> referrals.  Obtain a Weighted Average Performance of 90%+ and
> meet targets in all key priorities.

(Def. 56.1 ¶¶ 37–38; Pl. 56.1 ¶¶ 37–38 (quoting July of 2013 PIP, annexed to Certification in

Supp. of Def. Mot. as Exhibit K).)  As with his first performance review, Plaintiff "claimed that

the July 2013 PIP was unfair because it arose from the circumstances of the branch being

understaffed," (Def. 56.1 ¶ 42; Pl. 56.1 ¶ 42), and "refused to sign the July 2013 PIP," (Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41).

### i. Plaintiff's transfer to Union Turnpike branch

On August 5, 2013, Billia transferred Plaintiff to the Union Turnpike branch in Flushing, Queens. (Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44.) Defendant contends that the Union Turnpike branch was smaller and less busy than the 31st Avenue branch, and that Billia transferred Plaintiff there in order to help him succeed. (Def. 56.1 ¶ 44.) Plaintiff disputes that the Union Turnpike was less busy and states that there is no evidentiary support for the assertion that the transfer was to help him succeed. (Pl. 56.1 ¶ 44.)

Billia issued Plaintiff another PIP on November 6, 2013 identifying "the same areas of improvement required and action steps as the July 2013 PIP." (Def. 56.1 ¶¶ 48–49; Pl. 56.1 ¶¶ 48–49.) Plaintiff contends that Billia "simply cut and pasted the July 2013 performance improvement plan" to create the November 6, 2013 PIP. (Pl. 56.1 ¶ 49.) "Following the issuance of the November 6, 2013 PIP, Billia had weekly conversations with [Plaintiff] concerning his progress, including the branch's sales numbers and his leadership of the branch." (Def. 56.1 ¶ 51; Pl. 56.1 ¶ 51.)

In February of 2014, Billia gave Plaintiff a "requires improvement" rating and an overall annual performance rating of 1.66 out of 5.00, (Def. 56.1 ¶ 53; Pl. 56.1 ¶ 53), raising the following issues:

> (1) underperformance of the branches [Plaintiff] oversaw based on the WAP and other metrics; (2) failure to hold his team members accountable; (3) failure to use incentives to drive the sales process and motivate his staff; (4) failure to be assertive in management; (5) lack of knowledge of operational and policy issues; (6) issues with time management; and (7) inability to handle HR issues with team members.

(Def. 56.1 ¶ 54; Pl. 56.1 ¶ 54 (citing Pl. Feb. 5, 2014 Branch Manager Performance Review,

annexed to Certification in Supp. of Def. Mot. as Exhibit N).)  "Prior to the February 2014 performance evaluation, Billia spoke with [Plaintiff] concerning several of the deficiencies listed in the evaluation, such as his leadership, holding his staff accountable, and staying informed on performance and policy plans."  (Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59.)

In April of 2014, Billia issued Plaintiff a warning for "overall unsatisfactory sales performance and leadership based on his failure to execute on the expected sales behaviors set forth in the PIPs, noting his performance was 'well below expectations.'"  (Def. 56.1 ¶ 66; Pl. 56.1 ¶ 66.)  The warning specified that Plaintiff was not on pace for nine of the ten key goal areas contained in the PIP, reiterated many of the same issues raised in the PIPs and in the February 2014 performance review, (Def. 56.1 ¶ 67; Pl. 56.1 ¶ 67), and warned Plaintiff that "failure to demonstrate satisfactory and sustained improvement in the areas described" or "any other performance issues" "may lead to further disciplinary action, up to and including termination of employment at any time." (Def. 56.1 ¶ 68; Pl. 56.1 ¶ 68 (quoting April 2014 Verbal Warning, annexed to Certification in Supp. of Def. Mot. as Exhibit P).)

### ii.  Plaintiff's FMLA leave

On June 12, 2014, Plaintiff was involved in a car accident.  (Def. 56.1 ¶¶ 76–77; Pl. 56.1 ¶¶ 76–77.)  Plaintiff sustained injuries and obtained workers' compensation benefits.  (Def. 56.1 ¶¶ 76–77; Pl. 56.1 ¶¶ 76–77.)  Defendant granted Plaintiff FMLA leave starting on June 13, 2014.  (Def. 56.1 ¶ 78; Pl. 56.1 ¶ 78.)  During Plaintiff's leave, Tracy Ragoonanan and Vinny Marino, other branch managers, filled in for Plaintiff at the Union Turnpike branch.  (Def. 56.1 ¶ 82; Pl. 56.1 ¶ 82.)

According to Plaintiff, Billia attempted to demote or replace him while he was on leave. Vince Statile, a member of Defendant's Employee Relations department testified that he and

Billia "discussed moving Plaintiff to the float pool on a permanent basis while Plaintiff was on FMLA leave." (Pl. 56.1 ¶ 84.) Regional President Moran also testified that he discussed with Billia the possibility of transferring Plaintiff to a floating manager position after his return from FMLA leave. (Pl. 56.1 ¶ 81.) Plaintiff also contends that Billia "discussed that option with Defendant's Employee Relations department, but Employee Relations told . . . Billia that the Bank had to hold Plaintiff's spot as branch manager for the Union Turnpike branch until he returned from FMLA leave." (Pl. 56.1 ¶ 84.)

Two other bank employees also testified to comments made by Billia about Plaintiff before and during Plaintiff's FMLA leave. Rena Begum, floating branch manager, and branch employee Salina Moora testified that prior to Plaintiff's FMLA leave, Billia made negative comments about Plaintiff, including that the Union Turnpike branch was underperforming, that Plaintiff was "a joke" and failed to hold his employees accountable, and that Billia did not like Plaintiff and was trying to "get rid" of him. (Def. 56.1 ¶ 88.) While Plaintiff was on FMLA leave, Billia also made comments about Plaintiff being a "waste," wanting to terminate his employment, and wanting to replace him with Begum. (Def. 56.1 ¶¶ 83, 85; Pl. 56.1 ¶¶ 83, 85.) In addition, during a telephone conversation while Plaintiff was on FMLA leave, Billia told Moora that he felt that Plaintiff was "making it up" and "just taking time off." (Pl. 56.1 ¶ 167.) Billia denied making negative comments about Plaintiff or his leave while Plaintiff was out on leave. (Def. 56.1 ¶ 87; Pl. 56.1 ¶ 87; Billia Dep. Tr., 57:10–61:8, annexed to Certification in Supp. of Def. Mot. as Exhibit C.)

### iii. Plaintiff's return to work and his termination

Plaintiff returned to work from FMLA leave on July 30, 2014, resuming his position as branch manager of the Union Turnpike branch. (Def. 56.1 ¶ 90; Pl. 56.1 ¶ 90.) Defendant

approved Plaintiff's request for intermittent leave to accommodate his need to attend doctor's visits and physical therapy.  (Def. 56.1 ¶ 91; Pl. 56.1 ¶ 91.)

In September and October of 2014, Billia determined that Plaintiff could not handle the disruptive behavior of branch employee Meir Peer, who was acting in a disrespectful manner toward Plaintiff and Moora.  (Def. 56.1 ¶ 94; Pl. 56.1 ¶ 94.)  Plaintiff disputes that he was unable to handle the situation.  (Pl. 56.1 ¶ 94.)  During one incident, "Peer reacted in a threatening way toward Moora in front of customers — slamming doors, pacing back and forth, cursing and yelling."  (Def. 56.1 ¶ 95; Pl. 56.1 ¶ 95.)  Moora and Peer had another altercation, which resulted in Peer's transfer from Plaintiff's branch.  (Def. 56.1 ¶¶ 99–100; Pl. 56.1 ¶¶ 99–100.)

The Bank also determined in October of 2014 that Plaintiff failed to approve the eTime for his subordinates for all of 2014.  According to Defendant, Peer complained to Employee Relations concerning approval of his paid time-off.  (Def. 56.1 ¶ 102.)  "In response to Peer's complaint to Employee Relations, Employee Relations reviewed Peer's eTime submissions and discovered that [Plaintiff] had not been approving them."  (Def. 56.1 ¶ 103.)  "On October 23, 2014, Employee Relations reviewed all of [Plaintiff's] subordinates' time cards and found that he had failed to approve any of his subordinates' eTime for the entirety of 2014."  (Def. 56.1 ¶ 104.)  Plaintiff does not dispute that he failed to approve his subordinates' eTime at any point in 2014.  (Def. 56.1 ¶ 104; Pl. 56.1 ¶ 104.)

On October 27, 2014, Billia sent Plaintiff an email about activating his account to participate in Santander Spirit.  (Def. 56.1 ¶¶ 108–09; Pl. 56.1 ¶¶ 108–09.)  Despite the encouragement to managers to participate, Plaintiff had not activated his account.  (Def. 56.1 ¶¶ 107–08.)  After receiving the email from Billia, Plaintiff was able to successfully sign into his Santander Spirit account and send employees Santander Spirit recognitions.  (Pl. 56.1 ¶ 109.)

Plaintiff had previously experienced "difficulty signing into his Santander Spirit account and tried to reset the password . . . on multiple occasions." (Pl. 56.1 ¶ 109.)

After being made aware of the issues with eTime and Santander Spirit, Billia recommended that Plaintiff be terminated. (Billia Dep. 34:20–36:18.) Defendant terminated Plaintiff's employment on October 29, 2014. (Def. 56.1 ¶ 112.) During the termination meeting, Billia explained to Plaintiff that he was being terminated for subpar performance, including poor leadership skills exhibited throughout his employment, and as documented by a "climate study." (Def. 56.1 ¶ 117.) Billia also referred to Plaintiff's history of poor sales, referencing his low WAP data, including from the quarters during which he was on FMLA leave. (Pl. 56.1 ¶ 137; Termination Mtg. Tr., annexed to Pl. Mot. as Ex. 6, Docket Entry No. 32-2.)

Defendant now contends that it terminated Plaintiff because of:

> (1) his failure to handle employee issues, as exemplified by his ineffective handling of situations involving Saira Khan and Meir Peer; (2) his failure to approve eTime for the entire year of 2014; (3) his failure to participate in [Santander Spirit]; (4) his operational and leadership shortcomings; and (5) his poor and inconsistent sales numbers.

(Def. 56.1 ¶ 112.)

Plaintiff disagrees with Defendant's reasons for his termination and contends that he was terminated in retaliation for exercising his rights under the FMLA. (Pl. 56.1 ¶ 112.) Plaintiff also contends that Defendant's reasons for termination have shifted over time. In contrast to the currently asserted reasons for termination, Plaintiff asserts that Billia specified the following four reasons at the termination meeting: (1) "failure to approve eTime for his subordinates;" (2) "failure to assign Santander Spirit rewards;" (3) "the results of an 'HR climate survey' that Mr. Billia had conducted at the branch and showed that Plaintiff failed to show 'leadership;'" and (4) "the branch's overall performance numbers as measured by WAP." (Pl. 56.1 ¶ 112.)

In addition to arguing that the rationales for termination have shifted, Plaintiff contends that the proffered reasons have no basis in fact. Plaintiff, for example, asserts that although several other branch managers failed to approve their subordinates' eTime, Defendant did not discipline those managers. (Pl. 56.1 ¶¶ 142–55.) Plaintiff similarly argues that other managers did not fully participate in Santander Spirit. Defendant concedes that other supervisors failed to approve eTime for various periods and Defendant did not impose any discipline on those managers. Defendant, however, contends that it was unaware of other managers' eTime issues when they made the decision to terminate Plaintiff. (Def. 56.1 Reply ¶¶ 142–55, Docket Entry No. 30.) In addition, Defendant asserts that Plaintiff was the only active manager who had not given out any Santander Spirit rewards, or activated his account. (Def. 56.1 ¶¶ 107–08.)

### b. Judge Pollak's recommendations

Judge Pollak recommended that the Court deny Defendant's motion for summary judgment and grant Plaintiff leave to amend to add an ADA disability discrimination claim. (*See generally* R&R.)

### i. FMLA claim

Judge Pollak found that Plaintiff had established a prima facie case to support his allegations of FMLA retaliation, and although Defendant had presented legitimate non-retaliatory reasons for the termination, Plaintiff had presented sufficient evidence that the proffered reasons were pretext. (*Id.* at 27–32.)

### 1. Plaintiff's prima facie case

In finding a prima facie case of discrimination, Judge Pollak first found Defendant to be qualified for his position within the meaning of the FMLA. (*Id.* at 26.) Judge Pollak found this requirement easily satisfied because Defendant had not only hired Plaintiff but had continued to

employ him for more than two years. (*Id.* at 28.) Judge Pollak then found that Plaintiff had presented sufficient evidence of retaliatory intent based on the temporal proximity between Plaintiff's FMLA leave and his termination, Billia's negative actions and comments towards Plaintiff during his FMLA leave, and Plaintiff's contention that his performance was not as poor as described by Defendant, (*id.* at 30). Judge Pollak concluded that "[g]iven that there are material issues of fact about [P]laintiff's performance, as well as material issues of fact as to what Billia said while [P]laintiff was out on FMLA leave . . . [P]laintiff has sufficiently established the 'minimal' requirements of a prima facie case of FMLA retaliation." (*Id.* at 32.)

### 2. Defendant's non-retaliatory reasons

Judge Pollak found that Defendant had sufficiently articulated legitimate non-retaliatory reasons for Plaintiff's termination. Judge Pollak credited Defendant's assertions that Plaintiff was terminated due to "poor performance in terms of poor sales numbers, his lack of leadership, his failure to approve eTime and to participate in Santander Spirit, and other operational shortcomings." (*Id.* at 32.)

### 3. Pretext

Judge Pollak found that Plaintiff had presented genuine issues of material facts from which a jury could conclude that the proffered reasons for Plaintiff's termination were pretextual. (*Id.* at 33–42.)

### A. Climate study and employee issues

Judge Pollak first determined that Plaintiff had demonstrated pretext because of inconsistencies in Defendant's proffered rationales for termination. (*Id.* at 37.) Specifically, Judge Pollak found significant that Billia, the decisionmaker, had referred to a "climate study" as one basis for terminating Plaintiff during the termination meeting. Because Defendant had never

conducted a climate study, and was now arguing that the climate study was actually a reference to employee interviews, Judge Pollak found sufficient evidence of pretext. (*Id.*) Judge Pollak also found significant questions as to Billia's credibility, and on that basis found that there remained material disputes of fact sufficient to preclude summary judgment. (*Id.*)

### B. Issues with eTime and Santander Spirit

Judge Pollak also found pretext based on Plaintiff's argument that other managers were not terminated or punished for similar infractions with regards to eTime and Santander Spirit. (*Id.* at 37–38.) In finding pretext, Judge Pollak also credited Plaintiff's argument that he did not participate in these programs due to problems with his computer and passwords. (*Id.*)

### C. Sales numbers

Judge Pollak also found pretext based on Plaintiff's argument that there remained a dispute as to whether his sales numbers were actually as poor as that asserted by Defendant. (*Id.* at 39.) Judge Pollak also credited Plaintiff's argument that his numbers, to the extent they were low, were due to issues out of his control, namely the branch being understaffed. (*Id.* at 40.) In addition, Judge Pollak determined that Defendant's reliance on WAP numbers during the time Plaintiff was on FMLA leave demonstrated that the leave could have been at least one reason for termination. (*Id.* at 41.)

For these reasons, Judge Pollak recommended that summary judgment as to Plaintiff's FMLA retaliation claim be denied. (*Id.* at 42.)

### ii. NYSHRL and NYCHRL disability discrimination claims

Judge Pollak recommended that the Court deny Defendant's motion for summary judgment as to Plaintiff's disability discrimination claims under NYSHRL and NYCHRL for the same reasons that she recommended denying the motion as to Plaintiff's FMLA retaliation claim.

(*Id.* at 44–45.)

### iii. Leave to amend to assert ADA disability discrimination claim

Judge Pollak recommended that the Court grant Plaintiff "leave to amend his [Amended]

Complaint to plead a violation of the ADA for disability discrimination." (*Id.* at 46.) Judge

Pollak noted that Plaintiff concedes that his Title VII claim must be dismissed because that

statute does not address disability discrimination. (*Id.* at 42.) Because Defendant failed to

provide any specific reason that it would be prejudiced, Judge Pollak recommended that the

Court grant Plaintiff leave to plead a claim of disability discrimination under the ADA while

dismissing the Title VII claim. (*Id.* at 43, 46.)

## II. Discussion

### a. Standards of review

#### i. Report and Recommendation

A district court reviewing a magistrate judge's recommended ruling "may accept, reject,

or modify, in whole or in part, the findings or recommendations made by the magistrate

judge." 28 U.S.C. § 636(b)(1)(C). When a party submits a timely objection to a report and

recommendation, the district court reviews *de novo* the parts of the report and recommendation

to which the party objected. *Id.*; *see also United States v. Romano*, 794 F.3d 317, 340 (2d Cir.

2015). The district court may adopt those portions of the recommended ruling to which no

timely objections have been made, provided no clear error is apparent from the face of the

record. *John Hancock Life Ins. Co. v. Neuman*, No. 15-CV-1358, 2015 WL 7459920, at *1

(E.D.N.Y. Nov. 24, 2015). The clear error standard also applies when a party makes only

conclusory or general objections. *Benitez v. Parmer*, 654 F. App'x 502, 503–04 (2d Cir. 2016)

(holding "general objection[s] [to be] insufficient to obtain *de novo* review by [a] district court"

(citations omitted)); *see* Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file *specific* written objections to the [magistrate judge's] proposed findings and recommendations." (emphasis added)); *see also Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)").

### ii. Summary judgment

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

### b. Defendant's objections to the R&R

Defendant objects to Judge Pollak's recommendations that summary judgment be denied as to Plaintiff's FMLA retaliation and NYSHRL and NYCHRL disability discrimination claims,

and that Plaintiff be granted leave to amend the Amended Complaint to assert a claim under the ADA.  (*See generally* Def. Obj.)

### i.  FMLA retaliation claim

#### 1.  Prima facie claim for FMLA retaliation

Defendant argues that Judge Pollak erred in finding a prima facie case of FMLA retaliation because Plaintiff "did not and cannot establish causation between his leave or alleged disability and termination."  (Def. Obj. 1, 4.)  Defendant contends that in finding an inference of retaliatory intent, Judge Pollak incorrectly relied on Plaintiff's subjective belief in his performance in disregarding contrary objective evidence.  (*Id.* at 4–10.)  In particular, Defendant argues that Judge Pollak failed to properly consider Plaintiff's "long history of documented performance issues *pre-leave*," (*id.* at 5), "to take into account *that the same witnesses who testified about Billia's statements during leave* — employee Salina Moora and floating branch manager Rena Begum — *testified that he made similar comments before the leave*," (*id.* at 9), and that the "lapse in time between . . . leave and termination" "eviscerate[d] any inference of retaliation or causation," (*id.* at 10).

#### 2.  Pretext for proffered non-retaliatory reason

Defendant also argues that Judge Pollak erred in finding that a reasonable juror could determine the proffered legitimate non-retaliatory and non-discriminatory reasons for terminating Plaintiff were pretextual.  (Defs. Obj. 11.)  Defendant disputes Judge Pollak's findings and recommendations based on the following four arguments: (1) Plaintiff's subjective views of, or excuses for, his performance cannot demonstrate pretext, (*id.* at 11–12); (2) there is no material inconsistency in the explanation given for Plaintiff's termination, (*id.* at 12–15); (3) Defendant's reliance on Plaintiff's failure to approve eTime and participate in Santander Spirit is

not pretextual and no other manager had the same performance issues as Plaintiff, (*id.* at 16–18); and (4) Defendant's reliance on Plaintiff's poor sales numbers is not pretextual and Defendant's use of his WAP numbers for the period he was on FMLA as part of the basis for his termination could not lead a jury to find pretext because those numbers were higher than usual, (*id.* at 18–21).

### ii. NYCHRL and NYSHRL discrimination claims

Defendant objects to Judge Pollak's recommendation to deny summary judgment as to the NYSHRL and NYCHRL disability discrimination claims based on the same objections raised for the FMLA retaliation claim. (Def. Obj. 21–23.) As to the NYSHRL claim, Defendant contends that Plaintiff cannot establish pretext or demonstrate that "discrimination played any role" in his termination. (*Id.* at 22.) Likewise, Defendant argues Plaintiff cannot overcome his "own admissions" that he was terminated due to performance related issues, even under the "broader" scope of protection afforded by the NYCHRL. (*Id.*)

### iii. Leave to amend to convert Title VII claim into an ADA claim

Defendant objects to Judge Pollak's recommendation that Plaintiff be granted leave to amend to assert an ADA claim. (Def. Obj. 23–24.) As an initial matter, Defendant argues that Plaintiff is impermissibly seeking to amend his Complaint through his opposition submissions. (*Id.* at 23.) In addition to this procedural defect, Defendant argues that Plaintiff's request should be denied "because of the undue delay and prejudice it would cause . . . , as well as the fact that amendment would be futile." (*Id.* at 23.) Defendant argues that leave to amend would be prejudicial because of the belated timing of the request which was made after "discovery has closed and summary judgment is pending." (*Id.* at 24.) Furthermore, Defendant argues that amendment would be futile because an ADA disability claim cannot withstand summary

judgment for the same reasons as Plaintiff's other claims.  (*Id.* at 24.)

### c.  FMLA retaliation claim

Plaintiff asserts a claim for retaliation under the FMLA for his termination three months after returning from approved leave for injuries sustained during a car accident.  (Pl. Opp'n 7.) Defendant argues that this claim fails because Plaintiff cannot make out a prima facie case of retaliation or demonstrate pretext.  (Def. Mem. 17, 20.)

"The FMLA gives eligible employees an 'entitlement' to twelve weeks per year of unpaid leave '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'"  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 174 (2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)).  It "'creates a private right of action to seek both equitable relief and money damages against any employer . . .' should that employer 'interfere with, restrain, or deny the exercise of' FMLA rights.'"  *Id.* (quoting *Nev. Dept. of Human Res. v. Hibbs*, 538 U.S. 721, 724–25 (2003)).  "The Second Circuit recognizes distinct claims of interference and retaliation under the FMLA."  *Sista*, 445 F.3d at 175; *see also Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017) ("FMLA claims come in at least two varieties: interference and retaliation." (citing *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004))).  Retaliation claims "involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subject to some adverse employment action by the employer."  *Woods*, 864 F.3d at 166.

"At the summary judgment stage, retaliation claims brought pursuant to the FMLA are analyzed under the burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)."  *Alexander v. The Bd. of Educ. of City of New York*, 648 F. App'x 118, 121 (2d Cir. 2016).  Under that framework, a plaintiff must first establish a prima facie case of discrimination.

*Graziado v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016). A plaintiff's burden at this stage is "minimal." *Holcomb v. Iona Coll.*, 521 F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)). If a plaintiff meets her burden at this stage, the burden shifts to the defendant-employer to "demonstrate a legitimate, non-discriminatory reason for its actions." *Graziado*, 817 F.3d at 429; *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015). If the defendant-employer articulates such a reason, the burden shifts back to the plaintiff-employee to show that the defendant-employer's reason was pretext. *Graziado*, 817 F.3d at 429; *see also Sista*, 445 F.3d at 169 ("A plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext.").

### i. Plaintiff has established a prima facie case for retaliation

In order to make out a prima facie case of FMLA retaliation, a plaintiff must establish that "(1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168; *see also Turner v. Eastconn Reg'l Educ. Serv. Ctr.*, 588 F. App'x 41, 44 (2d Cir. 2014) (citing same); *Donnelly v. Greenburg Cent. Sch. Dist. No. 7*, 691 F.3d 134, 151 (2d Cir. 2012) (citing same). The plaintiff must demonstrate that his taking FMLA leave constituted "a negative factor" in the defendant's decision to terminate him. *Woods*, 864 F.3d at 169; *see also Hale v. Mann*, 219 F.3d 61, 68 (2d Cir. 2000) (holding that the FMLA "protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking leave pursuant to the FMLA").

The first and third elements of the prima facie framework are undisputed. Plaintiff exercised his rights under the FMLA when he took leave following his car accident. Defendant also does not dispute that termination is an adverse employment action. However, Defendant argues that Plaintiff was not qualified for his position within the meaning of the FMLA. Defendant also contends that the termination did not take place under circumstances giving rise to an inference of retaliation.

### 1. Plaintiff is qualified within the meaning of the FMLA

Defendant disputes that Plaintiff was qualified for his position in light of his "history of poor performance, from the [very] start of his employment." (Defs. Mem. 18.) In support, Defendant points to "coach[ing] and counsel[ing]" Plaintiff received two months into his employment, and a litany of issues including problems with his "leadership," "failure to implement . . . [various] policies, procedures, and programs," and poor sales. (*Id.* at 18.) Plaintiff first argues that the burden to demonstrate he was qualified for his position is "minimal" under the FMLA. (Pl. Opp'n 9.) Plaintiff also argues Defendant acknowledged his qualifications for his position "up until" his termination. (*Id.* at 10.) In addition, Plaintiff contends that Defendant was willing to transfer, rather than terminate, him prior to finding out about his "failure to approve subordinates' eTime and failure to participate in Santander Spirit." (*Id.* at 10.) Plaintiff thus argues that Defendant's argument requires the determination that his failures to approve eTime and participate in Santander Spirit made him unqualified for his position, an untenable proposition given others managers' failures to do the same. (*Id.*) Plaintiff contends that his perceived shortcomings are more appropriate to the analysis of whether Defendant's proffered reasons for his termination are pretextual. (*Id.* at 10–11.)

Under the FMLA, "the qualification necessary to shift the burden to defendant for an

explanation of the adverse job action is minimal." *Donnelly*, 691 F.3d at 147 (quoting *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2011). To shift the burden, "[a] plaintiff need not show good or even average performance." *Fuentes v. Cablevision Sys. Corp.*, No. 14-CV-32, 2016 WL 4995075, at *9 (E.D.N.Y. Sept. 19, 2016); *see also Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001) (same in Title VII context). Instead, a "plaintiff must show only that he possesses the basic skills necessary for performance of the job." *Donnelly*, 691 F.3d at 147 (quoting *Slattery*, 248 F.3d at 92. "Moreover, 'the qualification prong must not be interpreted in such a way as to shift into the plaintiff's *prima facie* case an obligation to anticipate and disprove the employer's proffer of a legitimate, non-[retaliatory] basis for its decision.'" *Id.* (quoting *Gregory*, 243 F.3d at 696). Indeed, "[i]t is unusual for a plaintiff to fail to meet this standard." *Id.*

Plaintiff has satisfied his minimal burden in demonstrating that he was qualified for his position as a branch manager for Defendant. Although there are disputes as to how poor his performance was as a manager, Defendant saw fit not only to hire Plaintiff but retain him for more than two years. *See Gregory*, 243 F.3d at 696 (holding that "[i]n a discharge case . . . the inference of minimal qualification is . . . easier to draw than in a hiring or promotion case because, by hiring the employee, the employer itself has already expressed a belief that [h]e is minimally qualified"). Furthermore, by Defendant's own admission, Plaintiff would not have been terminated but for the later discovery of his issues with eTime and Santander Spirit. Accordingly, the Court finds that Plaintiff was qualified for his position within the meaning of the FMLA. The Court also notes that Defendant did not dispute Judge Pollak's determination as to Plaintiff's qualifications.

### 2. Plaintiff has established a causal connection between his termination and his protected leave

Plaintiff relies on temporal proximity between his FMLA leave and termination, and also statements and actions of Billia, his former supervisor, to demonstrate an inference of retaliation. (Pl. Opp'n 11.)  With regards his former supervisor, Plaintiff asserts that Billia: (1) lied about the reasons for his termination; (2) discussed demoting Plaintiff while he was on FMLA leave; (3) offered Plaintiff's position to another worker while he was on FMLA leave; and (4) questioned whether Plaintiff was "actually injured" while making other derogatory comments about him. (*Id.*)  Defendant first argues that the circumstances do not give rise to a reasonable inference of retaliatory intent because Plaintiff's requests for leave had been approved.  (Def. Mem. 18.) Defendant also argues that a gap of three months from leave to termination is too attenuated for a finding of causation by temporal proximity, especially in light of Plaintiff's substantial pre- and post-leave performance issues.  (*Id.*)

The Second Circuit has held that in retaliation claims, a causal connection can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct;[2] or (2) directly, through evidence of retaliatory actions directed against the plaintiff by the defendant."  *Littlejohn v. City of New York*, 795 F.3d 297, 307, 319 (2d Cir. 2015) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  "Direct evidence may . . . include evidence of discriminatory statements or actions by employees who, while not the ultimate decisionmakers, have 'enormous influence in

---

[2] Disparate treatment evidence is but one type of circumstantial evidence that may be relied upon to establish a prima facie case of retaliation or discrimination.  *See Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) ("And as with the first stage of *McDonnell Douglas*, [plaintiff] is not required to provide evidence that similarly situated men were treated differently.").

the decision-making process.'" *Emmanuel v. Cushman & Wakefield, Inc.*, No. 13-CV-2894, 2015 WL 5036970, at *4 (S.D.N.Y. Aug. 26, 2015) (citation omitted); *see also Knox v. Town of Se.*, No. 11-CV-8763, 2014 WL 1285654, at *13 (S.D.N.Y. Mar. 31, 2014) ("In determining whether a remark is probative, courts consider four factors: (i) who made the remark . . . ; (ii) when the remark was made in relation to the employment decision at issue; (iii) the content of the remark . . . ; and (iv) the context in which the remark was made . . . ."), *aff'd*, 599 F. App'x 411 (2d Cir. 2015). Indirect evidence may include a "showing that the protected activity was closely followed in time by the adverse action." *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)); *see also, e.g.*, *Feingold v. New York*, 366 F.3d 138, 156–157 (2d Cir. 2004) ("[T]he requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two." (collecting cases)); *Nonnenmann v. City of New York*, 02-CV-10131, 2004 WL 1119648, at *22 (S.D.N.Y. May 20, 2004) ("Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999))).

Plaintiff has provided sufficient evidence demonstrating retaliatory animus in the form of statements and actions by Billia, and temporal proximity between his FMLA leave and termination. Although the timing of the termination is of limited value,[3] (*see* Pl. Mem. 11

---

[3] The Court does not rely on the temporal proximity between Plaintiff's intermittent leave for doctors' visits and physical therapy and his termination. Plaintiff did not advance any argument that he believed his intermittent leave was a cause of his termination. The Court does not presume that even employers who discriminate against employees taking prolonged leave

(acknowledging three months from leave to termination is "'on the outer edge' of temporal proximity")), Rena Begum and Salima Moora, managers with Defendant, both testified that Billia made negative remarks about Plaintiff while he was on FMLA leave. (Pl. 56.1 ¶ 85); *see also Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 124 (2d Cir. 2004) (holding uncorroborated discriminatory comments may "constitute 'direct evidence' . . . adequate to make out a prima facie case"); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 78 (2d Cir. 2001) (finding plaintiff's largely uncorroborated accounts to be sufficient to raise a genuine issue of fact as to the defendant's intent); *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 410 (2d Cir. 1991) (stating that employer's contention that plaintiff's proffered evidence of discriminatory comments "is uncorroborated and not credible is a jury argument inappropriate on a motion for summary judgment"). Both explained that Billia told them about Plaintiff "being a waste, wanting to terminate [Plaintiff's] employment and wanting to replace [Plaintiff] with Begum in the Union Turnpike branch." (Pl. ¶ 85, 168.) Moreover, Moora testified that Billia believed Plaintiff was "making . . . up [his need for FMLA leave]" and "just taking time off." (Pl. 56.1 ¶ 167.) These latter statements in particular are specifically critical of Plaintiff's taking protected leave. To be fair, the timing of these statements, made at a minimum three months prior to Plaintiff's termination, is at the outer limits of what courts in this Circuit consider probative of retaliatory animus. *See Del Franco v. New York City Off-Track Betting Corp.*, 429 F. Supp. 2d 529, 537 (E.D.N.Y. 2006) (finding no temporal connection between statements made

---

would consider intermittent leave to be problematic. Based on a review of the available case law, the Court has not been able to identify any decision where a court has *sua sponte* made the argument that intermittent leave, as opposed to the prolonged leave at issue, should be used to determine temporal proximity. *See also Haile-Iyanu v. Cent. Praking Sys. of VA, Inc.*, No. 06-CV-2171, 2007 WL 1954325, at *5 (D.D.C. July 5, 2007) (considering temporal proximity based on intermittent leave rather than original prolonged leave because plaintiff raised the issue).

"slightly more than three months" before termination), *aff'd*, 245 F. App'x 42 (2d Cir. 2007);

*Ellis v. Century 21 Dep't Stores*, 975 F. Supp. 2d 244, 276 (E.D.N.Y. 2013) ("[C]ourts in this

Circuit have generally found that a five month lapse between an allegedly discriminatory

statement and an adverse employment action is too long a gap to find the remark probative of

discrimination without some other evidence that the remark was related to the adverse

employment action.").  Nevertheless, taking into consideration Billia's prominent role in the

termination at issue, (*see* Billia Dep. 74:20–21 (admitting he recommended the termination)), the

doubt cast on the validity of Plaintiff's leave expressed by the content of the statements, and the

temporal proximity between leave and termination, the Court finds that Plaintiff has met his

burden to establish causation.[4]  Accordingly, Plaintiff has met his "minimal" burden to establish

a prima facie case of retaliation.  *See Holcomb*, 521 F.3d at 139 (quoting *Hicks*, 509 U.S. at 506).

### ii.  Non-retaliatory reason for termination

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts

to the employer to articulate some legitimate, non-retaliatory reason for the employment action."

*Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (citing *United States v.

Brennan*, 650 F.3d 65, 93 (2d Cir. 2011)).  An employer's "explanation of its reasons must be

clear and specific" in order to "afford the employee a full and fair opportunity to demonstrate

pretext."  *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (citation

omitted).  "Where an employer's explanation, offered in clear and specific terms, 'is reasonably

attributable to an honest even though partially subjective evaluation of qualifications, no

inference of discrimination can be drawn.'"  *Id.* (alterations omitted) (quoting *Lieberman v.*

---

[4]  The Court notes that Defendant's reliance on WAP data from Plaintiff's FMLA leave, discussed *infra* in the pretext analysis, also provides another basis for finding retaliatory animus. The same reasoning in the pretext section applies as to causation.

*Gant*, 630 F.2d 60, 67 (2d Cir. 1980)).

Defendant has sufficiently articulated legitimate, non-retaliatory reasons for Plaintiff's termination. Defendant asserts that it terminated Plaintiff because of his poor sales numbers, lack of leadership, failure to approve eTime and to participate in Santander Spirit. (Def. Mem. 20–22.) The Court also notes that neither party has objected to Judge Pollak's determination that Defendant has provided legitimate non-retaliatory reasons for Plaintiff's termination.

### iii.  Pretext for FMLA retaliation

Plaintiff advances several arguments for pretext, including, the same evidence used to demonstrate causation, in the form of statements and actions taken by Billia, (Pl. Mem. 19–21), inconsistencies in the proffered reasons for termination, (*id.* at 17–18), disparate treatment of comparator managers, (*id.* at 21–22), and the use of WAP data from his time on FMLA leave, (*id.* at 19). Defendant contends that Billia's statements and actions at most evince a pre-existing "low opinion" of Plaintiff, (Pl. Reply 4), that Plaintiff had a well-documented history of poor performance, including as compared to other managers, (*id.* at 5–10), any inconsistences in the rationales for termination were immaterial, (*id.* at 5), and that it would have been detrimental to Plaintiff not to consider the WAP data from his time on FMLA leave, (*id.* at 6–7).

### 1.  Plaintiff's prima facie evidence is insufficient to demonstrate pretext

Plaintiff's prima facie evidence is insufficient in and of itself to demonstrate pretext. As an initial matter, temporal proximity alone is insufficient to demonstrate pretext as a matter of law. *See Davies v. New York City Dep't of Educ.*, 563 F. App'x 818, 820–21 (2d Cir. 2014) ("We have been clear that temporal proximity between protected activity and an adverse employment action, alone, is insufficient to establish pretext." (citations omitted)). Similarly, Billia's statements and actions during Plaintiff's FMLA leave offer little probative value at the

pretext stage.  Not only were Billia's statements made at least three months prior to termination but almost all of the remarks indicate that any animus was directed at Plaintiff's poor performance rather than the exercise of his rights under the FMLA.  Taking into consideration Billia's comments prior to leave, during leave, and the intervening events following leave, even the expressed doubts about the validity of Plaintiff's leave are at most "isolated remarks" insufficient to withstand a motion for summary judgment.  *See Alexander v. The Bd. of Educ. of City of New York*, 648 F. App'x 118, 122 (2d Cir. 2016) (holding that a few "negative remarks concerning [plaintiff's] requesting and taking of FMLA leave" was insufficient to demonstrate pretext where no adverse action was taken until after an investigation); *see also Donnelly*, 691 F.3d at 141 (considering "the record taken as a whole" to determine propriety of summary judgment in FMLA context).

In addition, the mere fact that Billia and Defendant *considered* terminating Plaintiff during his FMLA leave is insufficient to demonstrate pretext.  Indeed, even *actual* termination during leave is not actionable unless FMLA leave is the cause.  *Hill v. New York City Hous. Auth.*, 220 F. Supp. 3d 499, 506 (S.D.N.Y. 2016) ("[T]he FMLA does not prevent an employer from terminating an employee during a period of leave, so long as the taking of FMLA leave was not the cause for the termination." (citation omitted)); *Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 428 (S.D.N.Y. 2004) ("The law is clear that an employee may be terminated while on medical leave, as long as the taking of the FMLA leave was not the cause for the termination."); *see also Sista*, 445 F.3d at 175 ("FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA leave." (quoting *Geromanos*, 322 F. Supp. 2d at 429)).  Rather than assuming that all negative actions or considerations during FMLA leave are impermissible,

Plaintiff needed to present evidence indicative of retaliatory animus.[5]

## 2. Inconsistencies in explanation for termination

Plaintiff argues that Defendant has advanced inconsistent rationales for termination. In particular, Plaintiff contends that "Billia falsely claimed [during the termination meeting] that [Defendant] had conducted a climate survey at the Union Turnpike branch and then lied about it in response to Plaintiff's interrogatories." (Pl. Mem. 11.) Defendant argues that Billia's "mislabeling of the employee interviews as a climate survey" is an immaterial inconsistency. (Def. Reply 6.) Despite the use of the term "climate survey," Defendant asserts that the substance of the rationale termination remained the same — that employees provided negative feedback about Plaintiff's leadership qualities. (Def. Reply 5–6.)

"A plaintiff may prove . . . retaliation . . . by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 430 (2d Cir. 2016) (quoting *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive."). To create a "jury issue on the question of pretext," the inconsistencies must also be *material*. *See Ehrbar v. Forest Hills Hosp.*, 131 F. Supp. 3d 5, 30 (E.D.N.Y. 2015) (citing *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001)); *Mathews v. Huntington*, 499 F. Supp. 2d 258, 267 (E.D.N.Y. 2007)

---

[5] The Court notes, however, that the prima facie evidence may aid in the assessment of Defendant's other proffered explanations of pretext.

(collecting cases).

Under these circumstances, Plaintiff has sufficiently demonstrated pretext through Defendant's inconsistent explanations.  In reaching this conclusion, the Court does not find the mere use of the term "climate survey" in lieu of "employee interviews" to be a material inconsistency.  Instead, the Court finds significant the importance *Defendant* attached to the term in its own responses to the interrogatories.  Rather than state that the term was merely a stand-in for employee interviews as they now argue, or explain that they could not recall whether such a term was used, *Defendant* affirmatively misstated in its interrogatories that Billia had not informed Plaintiff that a "climate survey" or "climate study" had been conducted during the termination meeting.[6]  (Def. Resp. to Pl. Interrog. ¶ 15, annexed to Pl. Mot. at Ex. 1, Docket Entry No. 32-2.)

The transcript of the termination also reads as though a climate survey had been conducted.  As to the purported climate study, Billia explained that he could not "really go through who they spoke to and stuff, but there [were] some things that were really kind of brought to [their] attention around leadership . . . . "  (Termination Mtg. Tr. 11:11–19.)  Billia further explained that "there's several individuals *including partners* who expressed a concern that whenever there's a new branch they don't feel that you're the leader." (*Id.* at 11:19–22.) This latter description of the findings of the purported climate study differs from the employee interviews that Billia described to be the actual reference points of the discussion in the termination meeting.  In his deposition, Billia explained that he was referring to prior discussions

---

[6] Defendant attached importance to the climate study twice in two different ways — first by informing Plaintiff that it was one of the bases for termination, and second by affirmatively misstating that Billia had not used the term in the termination meeting.

or interviews with Saira Khan and Meir Peer, "[Plaintiff's] subordinates." (Def. Mem. 13; Billia Dep. 21:24–22:4 ("I think I was referring to was . . . the investigation of Meir, and Saira, and Salina").) Although the *nature* of the described shortcomings in leadership may be consistent with other employee interviews, a climate study may speak to the *extent* of performance issues.[7] If the employee interviews, in conjunction with the other reasons for termination, were sufficient, Billia did not have to fabricate the existence *and* the content of a climate study. Interpreting the facts in a light most favorable to the non-movant, a reasonable jury could find that Billia materially *overstated* any existing performance issues to hide the real reason for termination. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 597 (6th Cir. 2006) (holding overstating reasons for adverse action may demonstrate pretext); *Carroll v. Sanderson Farms, Inc.*, No. 10-CV-3108, 2012 WL 3866886, at *13 (S.D. Tex. Sept. 5, 2012) (finding pretext where defendants "overstated the nature and number of employee complaints"); *Shah v. Dep't of Interior*, No. 99-CV-2566, 2001 WL 1104637, at *6 (E.D. La. Sept. 19, 2001) (finding overstatement of plaintiff's lack of qualifications to demonstrate pretext).

### 3.  WAP sales numbers

Plaintiff argues that Defendant's use of his WAP sales data while he was on FMLA leave constitutes both direct evidence of retaliation and pretext.[8] (Pl. Mem. 12–14, 19.) Plaintiff contends that it is undisputed that Billia "specifically discussed WAP metrics" as a reason for

---

[7]  There is no dispute that Defendant did not conduct a climate study.

[8]  The Court declines to consider Plaintiff's arguments questioning the validity of the assessment of his work performance based on his subjective beliefs, especially with regards to documented performance issues pre-leave for which he has not asserted were based upon any discriminatory or retaliatory animus. *See Fincher v. Depository Tr. & Clearing Corp.*, No. 06-CV-9959, 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) ("A plaintiff's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment."), *aff'd*, 604 F.3d 712 (2d Cir. 2010).

termination, without adjusting the numbers for FMLA leave. (*Id.* at 12.) Citing to out of circuit authority, Plaintiff asserts that the use of sales metrics taking into consideration figures for when he was on FMLA leave inherently means that his leave was considered a "negative factor" in his termination. (*Id.* at 12–13.) Defendant contends that this argument lacks merit because Plaintiff "*achieved the highest WAP numbers*" of his employment during the time he was out of FMLA leave. (Def. Reply 6.) Accordingly, Defendant argues that "to have ignored those quarters would have actually been detrimental to [P]laintiff." (*Id.* at 7.)

Based on the limited evidence and arguments before it, the Court determines that Plaintiff has demonstrated pretext through Defendant's use of WAP figures during the period of FMLA leave. *See Pagel v. TIN Inc.*, 695 F.3d 622, 629 (7th Cir. 2012) ("The FMLA does not require an employer to adjust its performance standards for the time an employee is actually on the job, but it can require that performance standards be adjusted *to avoid penalizing an employee for being absent during FMLA-protected leave*." (emphasis added)). Given the novel nature of this argument in the Circuit, the Court finds it necessary to clarify that it does not adopt either party's theory on this issue. Contrary to Plaintiff's assertions, there may be cases where the consideration of sales figures during FMLA leave plays no role, or perhaps even benefits the claimant. But contrary to Defendant's assertions, this case may not be one of them.

Relying on comparisons of Plaintiff's historical WAP figures, Defendant erroneously argues that Plaintiff logically cannot have been negatively impacted by the sales numbers during his FMLA leave because "[P]laintiff's best two quarters in terms of his branch's WAP performance were the second and third quarters of 2014," the periods he took FMLA leave. (Def. Resp. to Pl. 56.1 ("Def. Resp. 56.1") ¶ 132, Docket Entry No. 32-1.) Even if true, the WAP figures of 87.51 and 82.76 during those quarters were well-below average as compared to

other branches, ranking sixteenth and seventeenth out of nineteen branches respectively. (Def. Obj. 19.) Indeed, Defendant continues to assert that Billia had "set a goal of 100% WAP for each of his branches." (*Id.* at 19 n.7.) While the use of WAP figures may have "helped" Plaintiff's overall percentage, *assuming* that his WAP figures would have remained consistent with prior quarters, those figures are equally likely to have hurt him by adding two more sub-par quarters in the eyes of Billia. Defendant's flawed argument thus fails to take into consideration the cumulative impact poor performance or lack of perceived improvement may have on decisionmakers in making employment decisions. Billia's statements during the termination meeting, in fact, evince frustration that Plaintiff had not shown improvement or adequately performed during the periods he was out on FMLA leave. (*See* Termination Mtg. Tr. 12:15–21 ("And to be honest with you, from my standpoint I haven't seen a big improvement. I think the branch has the numbers [that] speak for themselves and right now we're continuing 61% of first quarter, 87% received . . . at quarter three was 84% . . . . ")); *see also id.* 27:1-4 ("[I]t's not one thing, it's an accumulation of a lot of things that have happened.").) Based on these facts, a reasonable juror could find that Plaintiff's FMLA leave played a role in his termination.[9] *See Pecora v. ADP, LLC*, 232 F. Supp. 3d 1213, 1229 (M.D. Fla. 2017) ("[I]t was incumbent upon [d]efendant to ensure that the performance standards accommodated for [plaintiff's] statutorily protected absence and did not have the *effect* of penalizing him for taking FMLA leave." (emphasis added)).

---

[9] Based on its arguments, Defendant presumably could have terminated Plaintiff prior to leave, during leave, and after leave for poor performance *without* taking into consideration the WAP data gathered during leave. Defendant presumably may also have been able to terminate Plaintiff had he continued to perform poorly following leave. But by taking the FMLA leave-based WAP figures into consideration, in a negative light, Defendant has created a material dispute of fact as to whether Plaintiff was punished in effect for taking protected leave.

#### 4. Issues with eTime and Santander Spirit

In addition, Plaintiff argues that he has also shown pretext as to Defendant's claim that he was terminated in part for failing to approve eTime for his subordinates and failing to participate in Santander Spirit. Plaintiff argues that other managers were not terminated or punished for either failing to approve eTime or participating in Santander Spirit. (Pl. Mem. 21–22.) As to eTime, Plaintiff contends that Defendant's failure to "conduct any investigation into whether [failure to approve eTime] was a common oversight" among managers demonstrates pretext. (*Id.* at 21.) As to the Spirit Program, Plaintiff argues that there were "other branch managers that failed to participate at the level Defendant wanted, but were not subject to discipline in any way."[10] (Pl. Opp'n 22.)

Plaintiff's arguments are meritless. While comparator evidence may be used to demonstrate pretext, Plaintiff fails to provide any examples of similarly situated managers who were not terminated or punished for comparable failures to approve eTime or participate in Santander Spirit. *See Franklin v. Liberty Lines Transit, Inc.*, 685 F. App'x 41, 44 (2d Cir. 2017) (holding comparators needed to be similar in "all material respects to permit a reasonable jury to draw an inference of pretext"); *see also Delia v. Donahoe*, 862 F. Supp. 2d 196, 222 (E.D.N.Y. 2012) (finding evidence of disparate treatment insufficient to demonstrate pretext where purported comparators did not have "comparable disciplinary histori[es]"); *Rommage v. MTA*

---

[10] Plaintiff also appears to ask the Court to infer the existence of a material dispute because Defendant has purportedly failed to fully respond to its discovery request about two branch managers' participation in Santander Spirit. (Pl. Mem. 21.) The Court declines to draw a negative inference against Defendant given Plaintiff's failure to raise this issue earlier in the litigation. Plaintiff should have made a good-faith effort to resolve the dispute with opposing counsel, and notified the Court outlining the nature of the dispute while attaching relevant materials if unable to come to an agreement, in compliance with Local Rule 37.3, rather than raising the issue for the first time in his opposition brief for summary judgment. *See* E.D.N.Y. Local. R. Civ. P. 37.3.

*Long Island Rail Rd.*, No. 08-CV-836, 2010 WL 4038754, at *9 (E.D.N.Y. Sept. 30, 2010)

(collecting cases), *aff'd*, 452 F. App'x 70 (2d Cir. 2012). Plaintiff also provides no support for

his argument that employers must clean house every time they decide to terminate an employee,

investigating all employees for conduct that formed the basis of each and every termination. The

Court declines to imply such an onerous duty on employers.

Based on the foregoing, the Court finds Plaintiff has sufficiently demonstrated pretext

based on the inconsistencies in the rationales advanced for termination, and Defendant's reliance

on WAP data from the FMLA leave period. Accordingly, the Court denies Defendant's motion

for summary judgment as to Plaintiff's FMLA claim.

### d. NYSHRL and NYCHRL disability discrimination claims

Both parties repeat the same arguments as to the FMLA retaliation claim for the

NYSHRL and NYCHRL disability discrimination claims. (*See* Def. Mem. 21 ("[Plaintiff's]

claims under the NYSHRL and NYCHRL fail . . . for the same reasons as his FMLA retaliation

claim."); Def. Reply (declining to address state discrimination claims at all); Def. Obj. 21 ("For

the same reasons set forth above, [Defendant] urges the Court to reject such reasoning as

erroneous and grant summary judgment on the disability discrimination claims."); (Pl. Opp'n 23

(relying on discussion as to the FMLA claim for all its disability discrimination claims).)

In light of the parties' sparse discussion on the New York state law claims, the Court

likewise imports its reasoning as to the FMLA retaliation claim to the NYSHRL and NYCHRL

disability discrimination claims. As discussed *supra*, Plaintiff has established a prima facie case

of discrimination and demonstrated that at least a few of the proffered legitimate non-

discriminatory reasons were pretextual. *See Ya-Chen Chen v. City Univ. of New York*, 805 F.3d

59, 75 (2d Cir. 2015) (holding NYCHRL claims are analyzed under a "similar framework");

*Krasner v. City of New York*, 580 F. App'x 1, 2 (2d Cir. 2014) (holding that NYSHRL claims are analyzed under a McDonnell Douglas burden shifting framework); *see also Ya-Chen Chen v. City Univ. of N.Y.*, 805 F.3d 59, 75 (2d Cir. 2015) (holding "summary judgment is appropriate [under NYCHRL] if 'the record establishes as a matter of law' that discrimination *or* retaliation 'play[ed] no role' in the defendant's actions." (first quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013); and then citing *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 38, 40 n.27 (App. Div. 2009)). Accordingly, the Court denies summary judgment as to Plaintiff's NYSHRL and NYCHRL claims.

### e.  Leave to amend

Plaintiff requests leave to amend to assert an ADA claim for disability discrimination. (Pl. Opp'n 22 n.9.) In making this request, Plaintiff admits that his Title VII claim based on disability was a mistake because that statute does not allow for such causes of action. Accordingly, the Court dismisses Plaintiff's Title VII claim. Defendant contends that the request should be denied because of the "undue delay and prejudice it would cause [Defendant], as well as the fact that amendment would be futile."[11] (Def. Opp'n 23.)

Rule 15 of the Federal Rules of Civil Procedure provide that courts "should freely give leave" to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has stated that "[t]his permissive standard is consistent with our strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (citation omitted). Leave to amend should be given "absent evidence of undue delay, bad

---

[11] In its reply submission in support of the motion for summary judgment, Defendant also requests that the Court deny leave to amend to add an FMLA interference claim because it would be "prejudicial to [Defendant] at this late stage, where discovery has closed and summary judgment is pending." (Def. Reply 7 n.3.) Presumably Defendant meant the same reasoning to apply to its request to deny any amendments to add an ADA claim. (*See id.* at 10 n.4.)

faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *see also Couloute v. Ryncarz*, No. 11-CV-5986, 2012 WL 541089, at *3 (S.D.N.Y. Feb. 17, 2012) (quoting *Monahan*, 214 F.3d at 283). However, motions to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008); *Monahan*, 214 F.3d at 283.

The Court grants Plaintiff leave to amend the Amended Complaint to add an ADA disability discrimination claim. Defendant fails to provide any specific evidence of undue delay or prejudice. Indeed, the Court notes that Plaintiff has always asserted disability discrimination claims under state law and under the incorrect federal statute. In light of the existing NYSHRL and NYCHRL disability discrimination claims, Defendant is unlikely to be prejudiced even as to information that could have been obtained through discovery.

### III. Conclusion

For the foregoing reasons, the Court denies Defendant's motion for summary judgment as to Plaintiff's FMLA retaliation, NYSHRL, and NYCHRL disability claims. The Court dismisses Plaintiff's Title VII claim but grants Plaintiff leave to amend the Amended Complaint to add an ADA disability discrimination claim. In so holding, the Court adopts Judge Pollak's recommendations as to the recommended judgment but substitutes its own reasoning for that of the R&R.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: March 31, 2018
      Brooklyn, New York